## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

No.: 5:14-cv-464

IRVING FELDBAUM, Derivatively on
Behalf of POWERSECURE
INTERNATIONAL, INC.,

               Plaintiff,

    v.

SIDNEY HINTON, CHRISTOPHER T.
HUTTER, W. KENT GEER, THOMAS J.
MADDEN III, KEVIN P. COLLINS,
JOHN A. MILLER, and A. DALE
JENKINS,

               Defendants,

   -and-

POWERSECURE INTERNATIONAL,
INC., a Delaware corporation,

         Nominal Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY,
WASTE OF CORPORATE ASSETS, AND
UNJUST ENRICHMENT**

DEMAND FOR JURY TRIAL

### NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of nominal defendant PowerSecure International, Inc. ("PowerSecure" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to PowerSecure's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     This action concerns breaches of fiduciary duty by certain of the Company's officers and directors relating to misrepresentations of the Company's ability to effectively manage operational costs commensurate with PowerSecure's increasing push for growth and new

business additions.  As explained in greater detail below, the Individual Defendants (as defined herein) are responsible for causing or allowing operational costs to skyrocket in attempt to keep pace with the Company's longstanding focus on growth, while at the same time misrepresenting the Company's business prospects to the investing public.

3.      PowerSecure is a provider of products and services to electrical utilities and various commercial, institutional, and industrial customers.  The Company's core business segment, Utility and Energy Technologies, consists of three sub-segments, including Interactive Distributed Generation ("Distributed Generation" or "DG"), Utility Infrastructure ("Utility Infrastructure" or "UI"), and Energy Efficiency ("Energy Efficiency" or "EE").  DG and UI are PowerSecure's largest business areas, collectively accounting for more than 82% of the Company's revenues in 2013.  As a result, PowerSecure's Board of Directors (the "Board") plays particularly close attention to these two segments.

4.      The Company's strategy has long "focused on growing these three product and service offerings."  Commensurate with this goal, the Individual Defendants have repeatedly assured the investing public that PowerSecure and its management are highly knowledgeable of the relevant markets and well equipped to handle sustained growth.

5.      Defendants further repeatedly stated that PowerSecure would achieve this growth while maintaining high operating margins.  In fact, in various recent U.S. Securities and Exchange Commission ("SEC") filings and public statements, the Individual Defendants repeatedly projected that PowerSecure would achieve gross margin percentages in the mid to high 20's for the first quarter of 2014.

6.      Despite the above assurances, on May 7, 2014, the Company disclosed that PowerSecure utterly lacked the resources and infrastructure necessary to achieve these promises.

In particular, PowerSecure disclosed that the Company's gross profit margin declined from 30.6% in the first quarter of 2013 to 20.9% in the first quarter of 2014, well below the Company's prediction of percentages in the mid to high 20's just two months prior. The Company further disclosed that it "mis-timed actions to shift resources to more profitable customers, as revenues from those new customers were not adequate to sustain [the Company's] margins." The Company's President and Chief Executive Officer ("CEO"), defendant Sidney Hinton ("Hinton"), further revealed that the Company was plagued with inefficiencies in its staffing and fleet, and that the Company was unable to convert large DG pipeline opportunities into sales. As a result of the above, for the first quarter of 2014, the Company was forced to report an adjusted loss of ($0.17) per share compared to analysts' consensus estimates of a $0.02 per share gain, in addition to the sharp decline in gross profit margin.

7.     The Company's revelations blindsided the market, and the reaction was swift and severe. On May 8, 2014, the day after the bad news was delivered, PowerSecure's stock plunged more than 62%, or $11.60 per share to close at $7 compared to the previous trading day's closing of $18.60, erasing almost $260 million in market capitalization.

8.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the Eastern District of North Carolina and the United States District Court for the Western District of North Carolina on behalf of investors who purchased PowerSecure shares.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive

action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) PowerSecure maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to PowerSecure, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12. Plaintiff Irving Feldbaum was a shareholder of PowerSecure at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current PowerSecure shareholder.  Plaintiff is a citizen of Pennsylvania.

**Nominal Defendant**

13. Nominal Defendant PowerSecure is a Delaware corporation with principal executive offices located at 1609 Heritage Commerce Court, Wake Forest, North Carolina.

Accordingly, PowerSecure is a citizen of Delaware and North Carolina. PowerSecure is a leading provider of products and services to electric utilities, and their large commercial, institutional, and industrial customers. Its Utility and Energy Technologies segment consists of three product and service offerings: Distributed Generation products and services, Utility Infrastructure products and services, and Energy Efficiency products and services.

**Defendants**

14.     Defendant Hinton is PowerSecure's President and CEO and has been since April 2007 and a director and has been since June 2007. Defendant Hinton is also President and CEO of PowerSecure, Inc., PowerSecure's core subsidiary, and has been since 2000. Defendant Hinton is named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendant Hinton knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) inability to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inability to convert larger DG project opportunities from PowerSecure's pipeline into its revenue backlog; and (iii) rapidly declining gross margins. PowerSecure paid defendant Hinton the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $595,000 | $4,501,750 | $629,688 | $662,487 | $6,388,925 |

Defendant Hinton is a citizen of North Carolina.

15.     Defendant Christopher T. Hutter ("Hutter") is PowerSecure's Chief Financial Officer and Treasurer and has been since December 2007; Executive Vice President and has been since March 2010; and Secretary and has been since September 2012. Defendant Hutter

was also a PowerSecure Vice President from December 2007 to March 2010. Defendant Hutter is named as a defendant in securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Hutter knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) inability to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inability to convert larger DG project opportunities from PowerSecure's pipeline into its revenue backlog; and (iii) rapidly declining gross margins. PowerSecure paid defendant Hutter the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2013 | $325,000 | $365,750 | $148,594 | $34,192 | $873,536 |

Defendant Hutter is a citizen of North Carolina.

16. Defendant W. Kent Geer ("Geer") is PowerSecure's Chairman of the Board and has been since June 2013 and a director and has been since June 2012. Defendant Geer is also a member of PowerSecure's Audit Committee and has been since at least April 2013 and was Chairman of that committee from at least April 2013 to June 2013. Defendant Geer knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) inability to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inability to convert larger DG project opportunities from PowerSecure's pipeline into its revenue backlog; and (iii) rapidly declining gross margins. PowerSecure paid defendant Geer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2013 | $95,250 | $100,000 | $195,250 |

Defendant Geer is a citizen of North Carolina.

17. Defendant Thomas J. Madden III ("Madden") is PowerSecure's Vice Chairman of the Board and has been since June 2013 and a director and has been since December 2008. Defendant Madden is also a member of PowerSecure's Audit Committee and has been since at least April 2013. Defendant Madden knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) inability to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inability to convert larger DG project opportunities from PowerSecure's pipeline into its revenue backlog; and (iii) rapidly declining gross margins. PowerSecure paid defendant Madden the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2013 | $84,000 | $50,000 | $134,000 |

Defendant Madden is a citizen of Georgia.

18. Defendant Kevin P. Collins ("Collins") is a PowerSecure director and has been since March 2000. Defendant Collins is also Chairman of PowerSecure's Audit Committee and has been since June 2013 and a member of that committee and has been since at least April 2013. Defendant Collins knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) inability to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inability to convert larger DG project opportunities from PowerSecure's pipeline into its revenue backlog; and (iii) rapidly declining gross margins. PowerSecure paid defendant Collins the following compensation as a director:

| | Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|---|
| | 2013 | $84,000 | $50,000 | $134,000 |

Defendant Collins is a citizen of Connecticut.

19.     Defendant John A. Miller ("Miller") was a PowerSecure director from September 2007 to June 2014.  Defendant Miller was also a member of PowerSecure's Audit Committee from April 2014 to June 2014.  Defendant Miller knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) inability to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inability to convert larger DG project opportunities from PowerSecure's pipeline into its revenue backlog; and (iii) rapidly declining gross margins.  PowerSecure paid defendant Miller the following compensation as a director:

| | Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|---|
| | 2013 | $84,000 | $50,000 | $134,000 |

Defendant Miller is a citizen of Massachusetts.

20.     Defendant A. Dale Jenkins ("Jenkins") is a PowerSecure director and has been since January 2014.  Defendant Jenkins is also a member of PowerSecure's Audit Committee and has been since January 2014.   Defendant Jenkins knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) inability to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inability to convert larger DG project opportunities from PowerSecure's pipeline into its revenue backlog; and (iii) rapidly declining gross margins.  Defendant Jenkins is a citizen of North Carolina.

21.     The defendants identified in ¶¶14-15 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14, 16-20 are referred to herein as the "Director

Defendants."  The defendants identified in ¶¶16-20 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶14-20 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

22.　　By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe PowerSecure and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage PowerSecure in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of PowerSecure and not in furtherance of their personal interest or benefit.

23.　　To discharge their duties, the officers and directors of PowerSecure were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of PowerSecure were required to, among other things:

(a)　　properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business operations;

(b)　　ensure that the Company complied with its legal obligations and requirements, including disseminating truthful and accurate statements to the investing public;

(c)　　conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide

the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)    remain informed as to how PowerSecure conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

24.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of PowerSecure, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

25.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to disseminate misleading statements about the Company's growth and business prospects, improper practices that wasted the Company's assets, and caused PowerSecure to incur substantial damage.

26.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of PowerSecure, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, PowerSecure has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

27.     In addition to these duties, under its Charter in effect since at least April 9, 2013, the Audit Committee Defendants, defendants Geer, Madden, Collins, Miller, and Jenkins, owed specific duties to PowerSecure to assist the Board in overseeing, among other things: (i) the quality and integrity of the Company's financial statements; (ii) the Company's system of internal control over financial reporting and disclosure controls and procedures; (iii) the quality and integrity of the Company's auditing, accounting, and financial reporting processes generally; and (iv) the Company's compliance with legal and regulatory requirements.   Moreover the Audit Committee's Charter provides that the Audit Committee is required to:

### A.     Financial Statements and Disclosure

1. Annual Financial Information. Review and discuss with management, the internal accountants and the independent auditors (i) the Company's audited annual financial statements, including the related notes thereto, (ii) the independent auditors' report thereon, and (iii) the Company's disclosures with respect thereto under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the annual financial statements of the Company should be included in the Company's Annual Report on Form 10-K (the "Form 10-K"), prior to filing the Form 10-K and publicly releasing annual earnings.

2. Quarterly Financial Information. Review and discuss with management, the internal accountants and the independent auditors the Company's quarterly financial statements, including the related notes thereto, and the Company's disclosures with respect thereto under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to filing the Quarterly Report on Form 10-Q and publicly releasing quarterly earnings.

3. Earnings Releases. Review and discuss with management the Company's earnings press releases, including the type of information to be included and its presentation and the use of any "pro forma" or "adjusted" non-GAAP financial information and earnings guidance, prior to public disclosure thereof.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

28.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

29.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of PowerSecure, regarding the Individual Defendants' management of PowerSecure's operations and the Company's ability to expand and allocate resources necessary to accommodate the Individual Defendants' tremendous push for growth; and (ii) enhance the Individual Defendants' executive and directorial positions at PowerSecure and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

30.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

31.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

32.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the

Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

33. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

34. PowerSecure is a provider of products and services to electrical utilities and various commercial, institutional, and industrial customers. The Company's core business segment, Utility and Energy Technologies, consists of three sub-segments, including Distributed Generation, Utility Infrastructure, and Energy Efficiency. Distributed Generation and Utility Infrastructure are PowerSecure's largest business areas. As a result, the Board plays particularly close attention to these two segments.

35. The DG segment involves manufacturing, installing, and operating electric generation equipment "on site" at facilities where the power is used, including commercial, institutional, and industrial operations. The DG segment is intended to provide backup power supply during power outages and provide lower cost power during high cost periods of peak power demand. The UI segment is focused on helping electric utilities design, build, upgrade, and maintain infrastructure that enhances the efficiency of their grid systems. The EE segment assists customers in achieving various energy efficiency goals through the use of light-emitting diode (LED) lighting fixtures and lamps, as well as certain other energy efficiency upgrades.

**The Company's Focus on Growth and Gross Profit Margins**

36.     The Company's core focus is on growing PowerSecure's DG, UI, and EE segments.  As the Company has repeatedly noted in its Annual Reports on Form 10-K, which were signed by each of the Individual Defendants:

> Our strategy is focused on growing these three product and service offerings because they address large unmet market opportunities due to their strong customer value propositions, and because they require unique knowledge and skills that utilize our core competencies.

37.     While growth is often good for companies, it can be harmful when fulfillment costs outweigh revenues.  In fact, according to PowerSecure, the Company's net income is "significantly influenced by the gross margins on the particular projects [that PowerSecure] complete[s], and on the mix of products and services which are delivered in that period."  As a result, the Individual Defendants claim that they are "particularly focused on the cost of sales," including "the cost of labor, materials, and other inputs that are directly associated with [each] particular project."

## THE INDIVIDUAL DEFENDANTS' MISLEADING STATEMENTS ABOUT THE COMPANY'S NEW BUSINESS OPPORTUNITIES AND PURPORTED ABILITY TO CAPITALIZE ON GROWTH

38.     Throughout 2014, the Individual Defendants aggressively acquired millions of dollars in new business while repeatedly assuring the investing public that PowerSecure was well equipped to handle sustained growth.  In fact, however, the Company was grossly unprepared to accommodate the growth, and the operational cost of this new business substantially drove down gross margins as a result.  Thus, this purported growth was actually having a negative impact on the Company's net profit.

39.     On January 6, 2014, the Company issued a press release announcing that PowerSecure added $50 million in new business.  Defendant Hinton touted that the Company

was off to a "strong start [for 2014] with order activity and backlog additions across all three of [the Company's] key business areas." The press release failed to disclose that the Company's mounting operational problems would result in substantially lower gross margins and net income.

40. The following month, on February 20, 2014, the Company issued another press release to announce that PowerSecure added $20 million in new business. The press release was again silent about the Company's inability to effectively manage the growth. Instead, defendant Hinton bragged about the Company's "continued strength in new order activity."

41. On March 10, 2014, twenty-one days before the end of the first quarter 2014, the Company filed its Annual Report on Form 10-K with the SEC. The Form 10-K reported that the Company had an all-time high revenue backlog of $248 million and assured the public that PowerSecure was well equipped to capitalize on its growing business prospects while maintaining a mid to upper 20%-range in gross margins. The Form 10-K failed to disclose that operational costs were skyrocketing due to the Company's inability to properly manage, allocate, and shift resources to meet the needs of PowerSecure's customers with high margins. The Form 10-K stated in relevant part:

> *[PowerSecure's] leaders and their teams have strong utility and customer relationships and a deep understanding of the markets we serve, and they are incentivized to grow these businesses profitably and on a sustained basis.*
>
> \* \* \*
>
> We believe that there is a substantial opportunity for the continued growth of our business because we are delivering differentiated products and services to a variety of underpenetrated and growing markets. Our growth strategy is to expand our solutions across existing and new utility partners and customers.
>
> \* \* \*
>
> [W]e realized inefficiencies in our Utility Infrastructure unit in 2013 related to the advanced deployment of crews in anticipation of being selected for a significant

long-term revenue opportunity with a major utility partner. We anticipate some continued inefficiencies from these excess crews, as well as some continued inefficiencies in our Energy Efficiency operations due to on-going realignment actions, to negatively impact our gross margins during the first quarter of 2014….

***In the near-term, we expect our total gross margins will be in the mid to upper 20%-range as we continue to realize strong growth in these lower margin products and service lines.***

The Form 10-K was signed by defendants Hinton, Hutter, Geer, Madden, Collins, Miller, and Jenkins.  In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by defendants Hinton and Hutter, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     Also on March 10, 2014, the Company issued a press release announcing the quarter-end and year-end financial results.  The press release announced revenue growth of 66.8% and net income growth of 43.3%, but failed to warn that continuing growth would soon be substantially offset by mounting operating expenses due to the Company's inability to adequately manage the new business deals.  Rather, defendant Hinton expressed "confidence that [the Company's] best-in-class solutions … will translate into a strong year for PowerSecure in 2014." The press release stated, in relevant part:

> "A very successful fourth quarter capped a record 2013 for PowerSecure with more than $100 million of revenues in both our distributed generation and utility infrastructure product lines, and our ESCO and Solais acquisitions significantly enhanced the scale and capabilities of our energy efficiency offerings," said Sidney Hinton, chief executive officer of PowerSecure.
>
> "Our record backlog, healthy order activity, exceptional balance sheet, and the benefits we are realizing from our acquisitions, all provide our team with confidence that our best-in-class solutions for large, growing and underserved markets, combined with our relentless commitment to serve our customers, will translate into a strong year for PowerSecure in 2014," Hinton added.
>
> **Fourth Quarter 2013:**
>
> \* \* \*

[Generally Accepted Accounting Principles ("GAAP")] gross margin as a percentage of revenue was 22.4 percent in 4Q 2013, compared to 33.0 percent in 4Q 2012. On a non-GAAP basis, excluding the inventory-related portions of the 4Q 2013 restructuring charge discussed below, gross margin as a percentage of revenue was 27.4 percent in 4Q 2013. The decrease in y-o-y [year-over-year] gross margin was driven by the restructuring charge, and the y-o-y growth of utility infrastructure, solar and ESCO revenues in 4Q 2013, which are generally lower gross margin product and service categories, as well as differences in the mix of projects completed in the two periods.

Operating expenses for 4Q 2013 were $18.3 million, compared to $13.4 million in 4Q 2012. Excluding the restructuring and executive compensation charges discussed below, 4Q 2013 operating expenses were $16.7 million or 22.6 percent of revenues, a 3.8 percentage point reduction on a y-o-y basis. Excluding the charges discussed below of $1.7 million and $1.1 million in Q4 2013 and Q4 2012, respectively, the $4.3 million increase in operating expenses consists of $2.9 million of on-going incremental operating costs related to the acquisitions of our ESCO, Solais and Encari businesses, and $1.4 million of increased operating expenses related to our revenue growth.

Operating margin as a percentage of revenue was negative 2.5 percent in 4Q 2013 on a GAAP basis, and positive 4.8 percent on a non-GAAP basis. This compares to positive 4.3 percent in 4Q 2012 on a GAAP basis, and positive 6.7 percent on a non-GAAP basis. The decrease in operating margins was driven by the decrease in gross margins, partially offset by a decrease in operating expenses as a percentage of revenues.

Diluted earnings per share (EPS) were a loss of $0.09 in 4Q 2013, compared to a gain of $0.08 in 4Q 2012. Excluding the charges discussed below, non-GAAP EPS were $0.13 in 4Q 2013, compared to $0.13 in 4Q 2012.

* * *

The company's revenue backlog stands at an all-time high of $248 million, as of the date of this release. This includes new business from awards announced on January 6, 2014 and February 20, 2014. The company's revenue backlog represents revenue expected to be recognized after December 31, 2013, for periods including the first quarter of 2014 onward.

43.     Later in the evening on March 10, 2014, the Company held a conference call with analysts and investors to discuss PowerSecure's latest SEC filings and press release. During the conference call, defendant Hinton touted that the Company was on the brink of acquiring business deals with much larger customers for PowerSecure's DG segment. He also assured

analysts that the Company was well equipped for such growth in the DG segment. Defendant Hinton further noted that the profitability of the UI segment was "a major corporate priority for [PowerSecure] in 2014," and assured that the Individual Defendants had "visibility in what [the Company] believe[s] will be another very good year in 2014" for that segment. Defendant Hinton stated, in relevant part:

> As we succeed in beginning to penetrate this large data center opportunity, ***it could have a transformative impact on our distributed generation business. And I say that, I emphasize this point, this is a big deal for you as investors and for the analysts. Penetration of the large data center opportunity could have a transformative impact on our distributed generation business.***

> \* \* \*

> I'd also point out that ***it's this kind of growth we've seen and managed very effectively throughout the history of the company***. I would also point out that the average size of our distributed generation project grew by 28% in 2013 versus 2012, which reflects the increasing contributions of the larger industrial, hospital, and small to mid-size data centers.

> \* \* \*

> ***Overall, our pipeline of potential distributed generation opportunities continues to reflect the highest quality of opportunities that we have ever had, and we feel very well positioned to continue growing our distributed generation revenues.***

> Turning now to utility infrastructure, which grew right at 82% year-over-year in the fourth quarter and right at 84% for the full year. Our growth continues to be driven by winning new business from new utility partners and expanding our business with existing partners with an additional contribution from the work we are doing for energy companies.

> \* \* \*

> With this developing relationship, with our backlog and with the high quality of sales in our pipeline, ***we have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business***.

> The profitability of this segment is a major corporate priority for us in 2014. ***We have an outstanding team of leaders there, and they are plowing ground and doing a tremendous job of building our great business, not just in 2013 and back, and not just for 2014, but looking out to 2015 and 2016, a great leadership team***.

\* \* \*

In summary, 2013 was a terrific year. Our strong revenue growth of 67%, our record backlog of $248 million, and ***the conversations that I have every day with our customers, with our utility partners, and with our employees, have us very excited about the continued growth and success of PowerSecure. We're well positioned for another record year in 2014 and our pipeline of opportunities is the healthiest we've ever seen, which bodes well for 2015.***

\* \* \*

***I can tell you across the board we don't see any weaknesses. It's a very, very, very healthy pipeline across the board, best we've ever had. Definitely in [UI], definitely in DG ... I mean it's–really, it's great. And we are very, very bullish on the pipeline, very bullish.***

44.    During the conference call, defendant Hutter added that the Company was largely successful in decreasing operating expense as a percentage of revenue and expanding its operating margins.  He further boasted that revenue growth in 2013 significantly outpaced operating expenses growth, but utterly failed to disclose that this trend would not continue in 2014 due to the Company's inability to keep pace with new business contracts, and inability to allocate operations to the businesses with the highest margins.  Defendant Hutter stated, in relevant part:

[A]n important goal heading into 2013 was to continue to translate our revenue growth into [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] growth and meaningful increases in EPS, primarily by decreasing our operating expense as a percentage of revenue and expanding our operating margins, and ***we have strong results to report against all of these measures***. And for those of you that have been following us for a while know, we've been very clear about those goals. And that's been the approach really for the last couple of years, to drive that type of leverage.

***Our revenue growth in 2013 significantly outpaced our operating expenses growth***. And this resulted in very nice operating expense leverage. As a result, our adjusted EBITDA was $22.1 million, which was almost double 2012's $11.2 million, and our EPS was $0.22 on a GAAP basis and $0.38 on a non-GAAP basis. This was up 38% and 73% respectively.

\* \* \*

*We expect 2014 gross margins to continue to be in the mid to high 20 percents*, with on-balance a little more risk than upside in the near term, driven by some of the cautiousness, and you heard Sidney talk about this with regard to our LED lighting realignment and potential cost of goods sold inefficiencies related to that transition, and a little more upside than risk as we move past that and into the second half of 2014.

\* \* \*

Okay. Very good. Let me turn to our revenue backlog. As of today, the revenue backlog is a record $248 million. This compares to $240 million at the time of our last earnings release and $183 million a year ago, so nice increases there. As we always describe in the earnings release, we break it down into three categories. We've got our near-term backlog, which is project based work, including orders for our DG, our UI, and our energy efficiency products that we expect to recognize over the course of the next three quarters. We've got a longer-term project-based work, and then we've got our recurring revenues that we measure every quarter.

\* \* \*

*Overall, our backlog implies continued growth*, as our near-term backlog is up 18% over last year at this time and our long-term backlog has almost quadrupled. As always, the key will be the timing of order conversion from our pipeline to our backlog, in other words, our ability to sell and execute. *We're in good position, and we remain strongly focused on the work to be done to deliver another year of strong numbers in 2014*, particularly given the tough year-over-year comparisons that we're facing as we move through the year.

## THE TRUTH EMERGES

45.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge just two months after the Individual Defendants last touted that the Company was well positioned to capitalize on growth while keeping operational costs low and margins high. On May 7, 2014, the Company reported a first quarter 2014 net loss of $4.3 million, or ($0.19) diluted EPS; non-GAAP EPS of ($0.17); and revenue of $52.8 million, as compared to net income of $733,000 or $0.04 diluted EPS; non-GAAP EPS of $0.04 and revenue of $45 million for the same period a year ago.  The Company further disclosed a gross profit margin declined to 20.9% from 30.6% in the first quarter of 2013, well below the

Individual Defendants' prediction of mid to high 20's. The press release revealed that the decrease was driven primarily by inefficiencies in PowerSecure's utility services group, including that the Company failed to appropriately shift equipment and people as needed. Finally, defendant Hinton revealed that the Company was struggling to convert larger DG project opportunities from the pipeline to the backlog. The press release stated, in relevant part:

"PowerSecure is well positioned for the long-term, but we were very disappointed with first quarter revenues and the degree to which our utility infrastructure revenue shortfalls and operating inefficiencies negatively impacted gross margins and our bottom line," said Sidney Hinton, chief executive officer of PowerSecure.

"Our strategic priority in utility infrastructure is to increase its long-term profitability, but we mis-timed actions to shift resources to more profitable customers, as revenues from those new customers were not adequate to sustain our margins. Based on the efforts we are undertaking to improve our utility infrastructure business, as well as protracted timing in converting larger distributed generation project opportunities from our pipeline into our backlog, we have reduced our revenue and profit expectations for 2014, as reflected in the outlook we have provided," Hinton continued.

* * *

GAAP gross margin as a percentage of revenue decreased to 20.9 percent in 1Q 2014 from 30.6 percent in 1Q 2013. On a non-GAAP basis, excluding the inventory-related portions of the 1Q 2014 restructuring charge discussed below, gross margin as a percentage of revenue was 21.5 percent in 1Q 2014. This year-over-year gross margin decrease was driven primarily by inefficiencies in our utility services group as we took actions to shift resources, including equipment and people, away from certain lower-profit assignments. Our intent was to deploy these resources towards customer opportunities to increase our long-term profitability. However, we were not successful in redeploying all of the assets to new assignments in a timely manner as a result of lower-than-expected revenues from certain customers. These productivity losses caused us to incur higher levels of personnel and equipment costs in our cost of goods sold as a percentage of our revenues, driving the gross margin on our utility services revenue to 5.9 percent for 1Q 2014, and our overall utility infrastructure revenue gross margin to 9.9 percent. This compares to 25.6 percent in 1Q 2013 and an average quarterly gross margin of 19.5 percent for utility infrastructure revenues in full year 2013.

46.     Also on May 7, 2014, the Company held a conference call with analysts and investors to discuss the financial results for the first quarter of 2014. During the conference call,

in stark contrast to defendants' March 2014 assurances that the Company was well equipped to handle continuing growth, defendant Hinton admitted that throughout 2013 the Individual Defendants were well aware that the Company's declining gross margins and utilization posed "significant issue[s]." He further admitted that the Company attempted to "slow that growth" towards the end of 2013 to "fix the[] gross margins" but "miss timed" its efforts, thus causing the significant decline. More, defendant Hinton revealed that the Company failed to convert large DG opportunities because the Company was "more accustomed to chasing, winning and forecasting" smaller projects.

47. On this news, PowerSecure's market capitalization plunged more than 62.3%, or $11.60 per share, on May 8, 2014, to close at $7 compared to the previous trading day's closing of $18.60, erasing almost $260 million in market capitalization in a single day.

## REASONS THE STATEMENTS WERE IMPROPER

48. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a) the Company's continuing growth and new business additions were significantly increasing operational costs, inefficiencies, and productivity losses, thus significantly reducing gross margins;

(b) the Company was not prepared to effectively manage the Individual Defendants' continuing push for growth and new business additions;

(c) the Company lacked the experience to expand and convert large DG project opportunities from its pipeline into revenue backlog; and

(d)     as a result of the foregoing, the Individual Defendants' representations concerning the Company's business prospects were improper.

## DAMAGES TO POWERSECURE

49.     As a result of the Individual Defendants' improprieties, PowerSecure disseminated improper, public statements concerning the Company's growth and ability to maintain certain gross margins.  These improper statements have devastated PowerSecure's credibility as reflected by the Company's almost $260 million, or 62.3%, market capitalization loss.  Further, because the Company has demonstrated its inability to effectively manage growth and large scale projects, the confidence in PowerSecure's operations has been shattered.  As a result, the Company will continue to suffer loss of revenue from potential new customers or other business partners in the foreseeable future.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

50.     Further, as a direct and proximate result of the Individual Defendants' actions, PowerSecure has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

(b)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to PowerSecure.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

51.     Plaintiff brings this action derivatively in the right and for the benefit of PowerSecure to redress injuries suffered, and to be suffered, by PowerSecure as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   PowerSecure is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

52.     Plaintiff will adequately and fairly represent the interests of PowerSecure in enforcing and prosecuting its rights.

53.     Plaintiff was a shareholder of PowerSecure at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current PowerSecure shareholder.

54.     Plaintiff has not made any demand on shareholders of PowerSecure because such demand would be futile.   As a widely-held public company, PowerSecure has over 22.3 million shares outstanding; identifying and making demand on the hundreds of thousands, if not millions, of shareholders who own these shares would be impossible for plaintiff, both as a matter of practical reality and in terms of financial cost.

55.     The current Board of PowerSecure consists of the following five individuals: defendants Hinton, Geer, Madden, Collins, and Jenkins.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Hinton, Geer, Madden, Collins, and Jenkins Face a Substantial Likelihood of Liability for Their Misconduct**

56.     As alleged above, defendants Hinton, Geer, Madden, Collins, and Jenkins

breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's growth and business prospects. For instance, just twenty-one days before the end of the first quarter of 2014, each of these defendants signed the March 10, 2014 Form 10-K which improperly assured the public that the Company's leaders and their teams had a deep understanding of the markets and were well equipped to capitalize on sustained growth while maintaining gross margins in the mid to upper 20%-range. These defendants knew or were reckless in not knowing that the Company was not effectively managing the continuing growth, including by properly allocating resources to maintain such high margins.

57. Because each of the defendant directors of PowerSecure also authorized the improper statements detailed herein that were disseminated directly to the public, they could not fairly and fully prosecute such a suit even if such suit was instituted by them.

58. Defendants Geer, Madden, Collins, and Jenkins, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance, including with respect to PowerSecure's decreasing gross margins and mounting operational costs. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a

substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

59.     The principal professional occupation of defendant Hinton is his employment with PowerSecure, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Specifically, defendant Hinton receives an annual salary of $595,000, which may increase at the Board's discretion, and also received $4,501,750 in stock awards, $629,688 in non-equity incentive plan compensation, and $662,487 in all other compensation, for a total of $6,388,925 in compensation in 2013.  Any demand on defendant Hinton would be futile because he is dependent upon the defendant directors implicated in the wrongdoing for his livelihood.  He will not vote to initiate an action against defendants Geer, Madden, Collins, and Jenkins, defendants who are not disinterested and/or independent and who exert influence over defendant Hinton's compensation by virtue of their positions as members of the Board.  This lack of independence renders defendant Hinton incapable of impartially considering a demand to commence and vigorously prosecute this action.

60.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for PowerSecure for any of the wrongdoing alleged by plaintiff herein.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duty

61.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

62. The Individual Defendants owed and owe PowerSecure fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe PowerSecure the highest obligation of good faith, fair dealing, loyalty, and due care.

63. The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within PowerSecure, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

64. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company was not sufficiently equipped to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inefficiencies in the Company's operations were severely decreasing PowerSecure's gross margins; and (iii) the Individual Defendants' and the Company's statements concerning PowerSecure's business operations and gross margins were inaccurate and misleading. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

65. The Director Defendants, as directors of the Company, owed PowerSecure the highest duty of loyalty. The Officer Defendants either knew or were reckless in not knowing that: (i) the Company was not sufficiently equipped to efficiently manage resources commensurate with the Individual Defendants' continuing push for growth and new business additions; (ii) inefficiencies in the Company's operations were severely decreasing PowerSecure's gross margins; and (iii) the Individual Defendants' and the Company's statements

concerning PowerSecure's business operations and gross margins were inaccurate and misleading.

66.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and these defendants failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

67.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PowerSecure has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

68.     Plaintiff, on behalf of PowerSecure, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

69.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70.     As a result of the decision to cause the Company to grow faster than it was equipped to properly maintain and manage, and the repeated issuances of misleading statements concerning the Company's growth and business prospects, the Individual Defendants have caused PowerSecure to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

71.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

72.     Plaintiff, on behalf of PowerSecure, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

73.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of PowerSecure.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to PowerSecure.

75.     Plaintiff, as a shareholder and representative of PowerSecure, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

76.     Plaintiff, on behalf of PowerSecure, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of PowerSecure, demands judgment as follows:

A.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing PowerSecure to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PowerSecure and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to

the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

      1.     a proposal to strengthen the Company's controls over financial reporting;

      2.     a proposal to strengthen the directors' oversight and control over operations, including with respect to resource and project management;

      3.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

      4.     a provision to permit the shareholders of PowerSecure to nominate at least three candidates for election to the Board; and

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of PowerSecure has an effective remedy;

D.     Awarding to PowerSecure restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 15, 2014

EVERETT GASKINS HANCOCK LLP

/s/ E.D. Gaskins, Jr.
E.D. Gaskins, Jr.
N.C. Bar No. 1606
Jason N. Tuttle
N.C. Bar No. 29479
James M. Hash
N.C. Bar No. 38221
The Historic Briggs Hardware Building
220 Fayetteville Street, Suite 300
P.O. Box 911
Raleigh, NC 27602
Telephone: (919) 755-0025
Facsimile: (919) 755-0009
ed@eghlaw.com
jason@eghlaw.com
james@eghlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (By Special Appearance)
CRAIG W. SMITH (By Special Appearance)
SHANE P. SANDERS (By Special Appearance)
GINA STASSI (By Special Appearance)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com
ssanders@robbinsarroyo.com
gstassi@robbinsarroyo.com

THE LAW OFFICES OF NICHOLAS
   KOLUNCICH III, LLC
NICHOLAS KOLUNCICH (By Special
Appearance)
6501 Americas Parkway NE
One Park Square – Suite 820
Albuquerque, NM 87110
Telephone: (505) 881-2228
Facsimile: (505) 881-4288

*Attorneys for Plaintiff*